UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AVALANCHE IP, LLC, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 20-cv-10102-ADB |
| | * | |
| FAM, LLC, | * | |
| | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO DISMISS
COUNTERCLAIM AND STRIKE AFFIRMATIVE DEFENSES**

BURROUGHS, D.J.

Plaintiff Avalanche IP, LLC ("AIP") initiated this action against Defendant FAM, LLC

("FAM"), alleging breach of contract.  [ECF No. 1 ("Compl.")].  In its answer and counterclaim

complaint, FAM asserted various affirmative defenses and brought a counterclaim for

promissory fraud.  [ECF No. 16 ("Ans.")].  Currently before the Court is AIP's motion to dismiss

FAM's counterclaim and strike its affirmative defenses pursuant to Federal Rules of Civil

Procedure 9(b), 12(b)(6), and 12(f).  [ECF No. 21].  For the reasons stated below, AIP's motion,

[id.], is GRANTED in part and DENIED in part.

I.      **BACKGROUND**

        A.      **Factual Background**

         The following facts are taken largely from FAM's counterclaim complaint, [Ans. at

5–9], the factual allegations of which are assumed to be true when considering a motion to

dismiss.  Jette v. United of Omaha Life Ins. Co., 387 F. Supp. 3d 149, 151 n.2 (D. Mass. 2019)

(citing Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 17 (1st Cir. 2008)).  The Court

also draws certain facts from AIP's complaint, to the extent FAM admitted to specific

allegations, and from documents incorporated into, or relied upon by, the parties' complaints, where the authenticity of those documents is not challenged.  See Alt. Energy, Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (holding that courts can consider documents incorporated into the complaint as well as any document upon which the complaint relies as long as the authenticity of the document is not challenged); cf. Pruco Life Ins. Co. v. Wilmington Trust Co., 721 F.3d 1, 11 (1st Cir. 2013) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." (quoting Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992))).

FAM is a California limited liability company with its principal place of business in Bell, California.  [Ans. at 5].  It is a "licensing, brand owner and manufacturing company" that licenses or owns trade names (e.g., Eddie Bauer, Bally's) and manufactures clothing and merchandise for sale, primarily at "club stores," such as Costco and Sam's Club.  [Id.].  AIP is a New York limited liability company with its principal place of business in New York, New York.  [Id.].  AIP owns the "Avalanche" brand; Avalanche-branded clothing is sold throughout the United States at sporting goods stores, clothing stores, club stores, and online.  [Id. at 6].

On November 28, 2016, FAM executed a license agreement (the "2016 Agreement") with Avalanche Licensing LLC ("AL"), the then-owner of the Avalanche brand.  [ECF No. 5 at 2–20].[1]  Pursuant to the 2016 Agreement, FAM would design and manufacture Avalanche-branded products, sell them at club stores, and pay AL royalties.  [Ans. at 6; Compl. ¶ 16].  The 2016 Agreement would expire on December 31, 2018 but FAM could extend it through the end of 2021 by exercising the first of its two three-year extension options.  [ECF No.

---

[1] FAM admits the authenticity of the 2016 Agreement.  [Ans. at 2].

5 at 19].  Under the 2016 Agreement, FAM was required to "use commercially reasonable efforts to promote, market, sell and distribute" the Avalanche-branded products covered by the agreement.  [Id. at 7].  The 2016 Agreement contains the following merger clause:

> This Agreement constitutes the entire understanding of the parties and revokes and supersedes all prior agreements between the parties, including any option agreements that may have been entered into between the parties, and is intended as a final expression of their Agreement.  It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents that may be in conflict with said Agreement.

[Id. at 15–16].

When the 2016 Agreement was executed, the Avalanche brand was owned by the Petrucci family.  See [Ans. at 6].  While the Petrucci family owned it, the Avalanche brand was "reasonably successful" and was a "real brand separate and apart from the club store business." [Id.].  In 2018, the Petrucci family sold the Avalanche brand to RBX, a large clothing company, with AIP emerging from the transaction as the entity owning the Avalanche brand.  [Id.]; see also [ECF No. 5 at 22].  After the sale to RBX, the presence of Avalanche products in non-club stores dramatically decreased as Avalanche clothing "essentially disappeared from brick and mortar locations outside of club stores."  [Ans. at 6].  Additionally, the Avalanche website ceased to be functional.  [Id.].  Moreover, after the acquisition by RBX, FAM no longer received "samples of core Avalanche products," which would have served as design templates and demonstrated a commitment to non-club store sales of Avalanche products.  [Id. at 7].  Because it is difficult to obtain placement of a product at a club store unless that product is also sold at retail stores and/or online, FAM's club store sales of Avalanche goods suffered, going from $7.1 million in 2017 to $2.65 million in 2018 and then to $125,000 in 2019.  [Id. at 6–7].

As 2018 neared its end, AIP and FAM discussed whether FAM would extend the 2016 Agreement by exercising its first extension option.  [Ans. at 7; ECF No. 23-1].  FAM was

uncertain and deliberated for more than a month.  See [ECF No. 23-1 at 2–6].  On January 2,

2019, Eli Yedid, AIP's CEO and Managing Partner, wrote the following in an email to a number

of FAM representatives:

> We paid a lot of money, and are spending significant efforts to make the Avalanche
> brand greater than ever.  It will be a $100 million+ brand by 2021.  We have the
> track record, and the resources to make it happen.  We don't see the clubs being
> less than $10 million per year.

[ECF No. 23-1 at 2; ECF No. 5 at 23 (demonstrating that Mr. Yedid was AIP's CEO and

Managing Partner)].  He orally delivered a similar message the same day.  [Ans. at 8].  Eleven

days later, FAM exercised its first option and extended the 2016 Agreement through December

31, 2021 (the "Extension").  [ECF No. 23-1 at 2; ECF No. 5 at 22–23].  Because of the

Extension, FAM was obligated to pay AIP a royalty advance of $350,000 upon execution of the

Extension and a guaranteed minimum royalty payment of $250,000 on July 1 of each year of the

extension period (i.e., 2019, 2020, and 2021).  [ECF No. 5 at 19].

## B.    Procedural Background

On January 17, 2020, AIP sued FAM, alleging that FAM had breached the 2016

Agreement by failing to make the $250,000 guaranteed minimum royalty payment due on July 1,

2019 (and failing to cure the breach during the contractual cure period).  [Compl. ¶¶ 16–17,

23–25].  FAM answered on February 21, 2020, asserting a number of affirmative defenses, and

counterclaimed against AIP alleging promissory fraud.  See generally [Ans.].  In sum, FAM

maintains that AIP fraudulently induced it into entering the Extension by falsely telling FAM

that it was devoting and would continue to devote resources to the Avalanche brand.  [Id. at 8–9].

On March 13, 2020, AIP moved to dismiss FAM's counterclaim and strike its affirmative

defenses.  [ECF No. 21].  FAM opposed, [ECF No. 26], and AIP replied, [ECF No. 29].

## II.   LEGAL STANDARD

"District courts apply the same legal standard to motions to dismiss counterclaims pursuant to Rule 12(b)(6) as they do when reviewing motions to dismiss a complaint." Lexington Luminance LLC v. Osram Sylvania Inc., 972 F. Supp. 2d 88, 91 (D. Mass. 2013).  In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible . . . ."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane."  A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st

Cir. 2013) (citing <u>Grajales</u>, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  <u>Id.</u> (quoting <u>Morales-Cruz v. Univ. of P.R.</u>, 676 F.3d 220, 224 (1st Cir. 2012)).  Secondly, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  <u>Id.</u> (quoting <u>Morales-Cruz</u>, 676 F.3d at 224).

Because FAM alleges promissory fraud, Federal Rule of Civil Procedure 9(b)'s special pleading requirements apply to its claim.[2]  <u>See</u> <u>Extreme Reach, Inc. v. Media</u>, No. 14-cv-14725, 2015 WL 4601224, at *1 (D. Mass. July 31, 2015).  Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  One of the primary purposes of Rule 9(b)'s particularity requirement is to "place the defendants on notice and enable them to prepare meaningful responses."  <u>New Eng.</u> <u>Data Servs., Inc. v. Becher</u>, 829 F.2d 286, 289 (1st Cir. 1987).  In the First Circuit,[3] plaintiffs are required to set out "the who, what, where, and when of the allegedly false or fraudulent representation," <u>Alt. Sys. Concepts, Inc. v. Synopsys, Inc.</u>, 374 F.3d 23, 29 (1st Cir. 2004), and

---

[2] Although FAM is asserting state law claims and affirmative defenses, because this case is proceeding in federal court, the Federal Rules of Civil Procedure apply.  <u>Universal Commc'n</u> <u>Sys., Inc. v. Lycos, Inc.</u>, 478 F.3d 413, 427 (1st Cir. 2007) ("Although state law governs the burden of proving fraud at trial, the procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure 9(b)." (quoting <u>Hayduk v. Lanna</u>, 775 F.2d 441, 443 (1st Cir. 1985))).

[3] AIP cites to Second Circuit and Ninth Circuit law regarding Rule 9(b)'s requirements.  <u>See</u> [ECF No. 22 at 17].  Even if the underlying substantive law governing a fraud claim is from a state outside of the First Circuit, the Court still applies First Circuit law.  <u>See, e.g.</u>, <u>Katz v.</u> <u>Liberty Power Corp.</u>, No. 18-cv-10506, 2019 WL 4645524, at *8–9 (D. Mass. Sept. 24, 2019) (determining that Rule 9(b) applied to the plaintiffs' claim for fraudulent transfer under Florida law and then applying the First Circuit's interpretation of Rule 9(b) in assessing whether the plaintiffs had adequately alleged fraud).

"identify[] the basis for inferring scienter," <u>Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.</u>, 419 F. Supp. 3d 176, 189 (D. Mass. 2019) (quoting <u>N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale</u>, 567 F.3d 8, 13 (1st Cir. 2009)).  "[T]he specificity requirement extends only to the particulars of the allegedly misleading statement itself.  The other elements of fraud, such as intent and knowledge, may be averred in general terms." <u>Rodi v. S. New Eng. Sch. of Law</u>, 389 F.3d 5, 15 (1st Cir. 2004) (citations omitted); <u>see also</u> <u>Runyon v. Wellington Mgmt. Co., LLP</u>, No. 13-cv-11236, 2015 WL 1276825, at *5 (D. Mass. Mar. 20, 2015) (noting that "reliance" is not subject to Rule 9(b)'s heightened pleading requirement).

Under Federal Rule of Civil Procedure 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Courts in this district

> do not . . . view motions to strike affirmative defenses for legal insufficiency under Rule 12(f) favorably.  The general policy is that the pleadings should be treated liberally, and that a party should have the opportunity to support [its] contentions at trial.  Motions to strike affirmative defenses should be granted only when it is beyond cavil that the defendant could not prevail on them.  However, a plaintiff may prevail on a Rule 12(f) motion where it clearly appears that the plaintiff would succeed despite any state of facts which could be proved in support of defense.

<u>PetEdge, Inc. v. Marketfleet Sourcing, Inc.</u>, No. 16-cv-12562, 2017 WL 2983086, at *4 (D. Mass. July 12, 2017) (alteration in original) (citations and internal quotation marks omitted).

## III.     DISCUSSION

### A.     Choice of Law

The 2016 Agreement contains a New York choice-of-law provision.  [ECF No. 5 at 15]. In its answer, FAM asserts four affirmative defenses: (1) that AIP has failed to state a claim, (2) that AIP fraudulently induced FAM into agreeing to the Extension, (3) that AIP cannot recover because it has unclean hands, and (4) that AIP failed to mitigate damages.  [Ans. at 4]. FAM also brings an independent counterclaim for promissory fraud (which is, in substance,

identical to the fraud-based affirmative defense).  [Id. at 8–9].  The parties seemingly agree that New York law governs the first affirmative defense (failure to state a claim), the third affirmative defense (unclean hands), and the fourth affirmative defense (failure to mitigate damages).  See [ECF No. 22 at 7–8; ECF No. 26 at 10–11].  As to the remaining affirmative defense and the counterclaim based on fraud, the parties also seemingly agree that the 2016 Agreement's choice-of-law provision does not control, that either California law or New York law should govern because FAM is from California and AIP is from New York, and that the Court will not be able to make a choice of law determination without the benefit of at least some discovery. See [ECF No. 22 at 8; ECF No. 26 at 4 n.1].  Because both parties agree that California and New York law are essentially the same with respect to fraud, [ECF No. 22 at 8; ECF No. 26 at 4 n.1], and because the choice of law between these two will not change the outcome, the Court need not decide which state's law controls.  Okmyansky v. Herbalife Intern. of Am., Inc., 415 F.3d 154, 158 (1st Cir. 2005).  Accordingly, the Court will assess affirmative defenses (1), (3), and (4) under New York law and affirmative defense (2) and FAM's counterclaim with reference to both California and New York law, which it finds materially indistinguishable for present purposes.

### B. Promissory Fraud

Under New York law, the "required elements of a common-law fraud claim are a misrepresentation or material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  Ambac Assurance Corp. v. Countrywide Home Loans, Inc., 106 N.E.3d 1176, 1182 (N.Y. 2018) (alteration in original) (citation and internal quotation marks omitted).  Similarly, under California law, the "elements of fraud are: (1) a misrepresentation (false representation, concealment, or

nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce

reliance; (4) justifiable reliance; and (5) resulting damage." Robinson Helicopter Co. v. Dana

Corp., 102 P.3d 268, 274 (Cal. 2004) (citing Lazar v. Super. Ct. of L.A. Cnty., 909 P.2d 981, 984

(Cal. 1996)).[4]

     As an initial matter, AIP argues that FAM's fraud counterclaim cannot be premised on

the oral statements referenced in FAM's answer because FAM's allegations regarding those oral

statements do not satisfy the heightened pleading requirements of Federal Rule of Civil

Procedure 9(b).  [ECF No. 22 at 17].  AIP further asserts that the counterclaim (and the

affirmative defense based on the same alleged fraud) must be dismissed because (1) the allegedly

fraudulent statements were puffery or opinion, (2) FAM has failed to plausibly plead fraudulent

intent, and (3) FAM has failed to properly plead reasonable reliance.  [Id. at 8–16; ECF No. 29 at

2–10].

     1.    Allegedly Fraudulent Statements and Rule 9(b)'s Requirements

     In support of its fraud claim, FAM identifies multiple allegedly fraudulent statements:

statements in Mr. Yedid's January 2, 2019 email; Mr. Yedid's January 2, 2019 oral statements;

and unattributed "similar promises."  [Ans. at 7–8].  Federal Rule of Civil Procedure 9(b)

requires that a pleading that alleges fraud must set out the "who, what, where, and when of the

allegedly false or fraudulent representation."   Alt. Sys. Concepts, 374 F.3d at 29.  Here, FAM

has met Rule 9(b)'s requirements with regard to Mr. Yedid's January 2, 2019 statements (both

those in the email and those made orally) but has not done so with regard to the other "similar

promises."  With respect to the statements contained in the January 2, 2019 email, FAM has

---

[4] The parties do not contest that FAM has adequately alleged injury, see generally [ECF Nos. 22, 26, 29], so the Court will not address that element.

identified the who (Mr. Yedid emailed Mr. Spotts, Ms. Emamjomeh, and Mr. Zabari), the what

(the content of the email), the where (via email), and the when (January 2, 2019) of the allegedly

fraudulent statement.  <u>See</u> [Ans. at 7–8; ECF No. 23-1 at 2].  Similarly, with respect to the

January 2, 2019 oral statements, FAM has identified the who (Mr. Yedid spoke to some

combination of Mr. Spotts, Ms. Emamjomeh, and Mr. Zabari), the what (that "[AIP] had

committed funding to the Avalanche brand and that if FAM renewed the license, it would pump

funding into the Avalanche brand and maintain it as a real brand outside of the club stores"), the

where (via telephone),[5] and the when (January 2, 2019).  [Ans. at 8].  These allegations are

sufficient to put AIP on notice and allow it to defend itself, which is the main purpose of Rule

9(b)'s heightened pleading standard.  <u>See</u> <u>New Eng. Data Servs.</u>, 829 F.2d at 289.

AIP also argues that, even assuming that FAM has adequately pleaded the "who, what,

where, and when," it has failed to adequately plead facts suggesting that the statements in

Mr. Yedid's email regarding AIP's past and current efforts were, in fact, false.  [ECF No. 22 at

11–12].  FAM's allegations, however, are sufficient for present purposes.  <u>See</u> <u>Rodi</u>, 389 F.3d at

15 ("[T]he specificity requirement [for pleading fraud] extends only to the particulars of the

allegedly misleading statement itself.").  FAM asserts that, after the RBX acquisition in the

middle of 2018, Avalanche-branded apparel stopped being sold in non-club stores and the

Avalanche website became defunct.  [Ans. at 6].  Additionally, FAM alleges that AIP stopped

providing samples of Avalanche products and that FAM's 2018 and 2019 sales were

---

[5] Although FAM does not explicitly state that the conversation happened over the phone, based on other facts alleged, including that the parties were in different geographic locations, the Court can reasonably infer that the conversation did not take place in person.  Moreover, when the context of the communication is clear, it is not always necessary to identify exactly how the communication took place.  <u>Cf.</u> <u>Rodi</u>, 389 F.3d at 15 (finding allegedly fraudulent misrepresentation had been adequately pleaded when it was specific as to "speaker, content, *context*, and time" (emphasis added)).

dramatically lower than its sales in 2017 (before the RBX acquisition).  [Id. at 7].  Taken

together, those allegations suggest that AIP's statements (i.e., that it had spent "a lot" of money

and that it was expending "significant efforts" with an eye towards strengthening the Avalanche

brand) were false.  Prior to discovery, the Court will not require FAM to allege with specificity

the amount of money and resources, if any, AIP spent or was spending to improve the Avalanche

brand.

### 2.   Puffery or Opinion

AIP next argues that Mr. Yedid's January 2, 2019 statements are inactionable puffery or

opinion.  [ECF No. 22 at 9–13].  FAM maintains that the statements contain concrete factual

assertions sufficient to support a fraud claim.  [ECF No. 26 at 4–7].

Under New York law, "[v]ague expressions of hope and future expectation or mere

opinion and puffery . . . provide an insufficient basis upon which to predicate a claim of fraud."

High Tides, LLC v. DeMichele, 931 N.Y.S.2d 377, 381 (N.Y. App. Div. 2011) (alteration in

original) (citations and internal quotation marks omitted).  Similarly, under California law,

"[f]raudulent representations, to constitute ground for relief, must be as to existing and material

facts; predictions of future events are ordinarily considered non-actionable expressions of

opinion."  Richard P. v. Vista Del Mar Child Care Serv., 165 Cal. Rptr. 370, 372 (Cal. Ct. App.

1980).

> In the January 2, 2019 email, Mr. Yedid wrote:
>
> We paid a lot of money, and are spending significant efforts to make the Avalanche brand greater than ever.  It will be a $100 million+ brand by 2021.  We have the track record, and the resources to make it happen.  We don't see the clubs being less than $10 million per year.

[ECF No. 23-1 at 2].  This email includes at least two statements of fact.  First, that AIP had,

before January 2, 2019, paid "a lot" of money "to make the Avalanche brand greater than ever"

and second, that, as of the same date, AIP was "spending significant efforts" to "make the Avalanche brand greater than ever." [Id.].  That the email also contained opinion and/or prediction (e.g., that Avalanche would be a $100 million brand by 2021 and that AIP anticipated that sales of its products at club stores would be no less than $10 million per year) does not render otherwise actionable statements inactionable by association.  See Solomon Cap., LLC v. Lion Biotechnologies, Inc., 98 N.Y.S.3d 26, 28 (N.Y. App. Div. 2019) (noting that although one statement made during a conference call was "mere puffery," other statements were actionable); Lion Raisins, Inc. v. Conn. Indem. Co., No. 03-cv-06744, 2006 WL 509536, at *14 (E.D. Cal. Mar. 2, 2006) ("Here, specific representations are mixed in with some generalized exaggerations.").  AIP maintains that because the term "significant" is not readily quantifiable and cannot be objectively proven, the statements in the email are not actionable.  [ECF No. 22 at 11].  Courts applying New York and California law have, however, concluded that similar statements can support fraud claims.  See Solomon, 98 N.Y.S.3d at 28 (finding that although terms like "massive investors" and "high-value investors" were "partially hyperbolic," they were nevertheless "concrete factual representations"); Lion Raisins, 2006 WL 509536, at *14 (finding statement that insurance company would investigate claims "promptly" and "thoroughly" potentially actionable).  Moreover, as FAM notes, see [ECF No. 26 at 4, 7], the discovery process will clarify whether AIP had spent "a lot of money" or was then "spending significant efforts" with an aim towards improving the Avalanche brand.  What dollar figure constitutes "a lot" or whether specific efforts are "significant" can then be resolved by a factfinder.  The fact that Mr. Yedid described AIP's expenditures qualitatively as opposed to quantitively will not, alone, foreclose a fraud claim.

The second allegedly fraudulent statement, Mr. Yedid's January 2, 2019 oral statement that "[AIP] had committed funding to the Avalanche brand and that if FAM renewed the license, it would pump funding into the Avalanche brand and maintain it as a real brand outside of club stores," [Ans. at 8], is not merely puffery or opinion for similar reasons.  In this statement, Mr. Yedid communicated to FAM's representatives that, as of January 2, 2019, AIP had "committed funding to the Avalanche brand."  [Id.].  That is a concrete factual statement capable of being objectively evaluated.  Moreover, the statement that AIP would take certain action (i.e., pump funding into the Avalanche brand and maintain it as a real brand outside of the club stores) if FAM agreed to the Extension was a promise to do something in the future, not merely a "[v]ague expression[] of hope and future expectation or mere opinion and puffery."  High Tides, 931 N.Y.S.2d at 381 (first alteration in original).   This sort of forward-looking promise is the classic basis for a promissory fraud claim.  See Beckwith v. Dahl, 141 Cal. Rptr. 3d 142, 161 (Cal. Ct. App. 2012) (citing Bldg. Permit Consultants, Inc. v. Mazur, 19 Cal. Rptr. 3d 562, 572 (Cal. Ct. App. 2004))); Moon v. Clear Channel Commc'ns, 763 N.Y.S.2d 157, 160–61 (N.Y. App. Div. 2003).

The cases cited by AIP do not compel a different conclusion.  Each is readily distinguishable based on the content and/or context of the allegedly fraudulent statements being evaluated.  See, e.g., Altayyar v. Etsy, Inc., 731 F. App'x 35, 38 (2d Cir. 2018) (distinguishable because "striv[ing]" to achieve a goal is different than committing resources to achieving a goal); Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir. 2003) (distinguishable because a statement that a company is "develop[ing] a more aggressive marketing campaign to advertise" a product is less concrete than a statement that a company had already spent money and was devoting effort to a campaign); Gregory v. ProNAi Therapeutics Inc., 297 F. Supp. 3d

372, 399 (S.D.N.Y. 2018) (distinguishable because noting a company's "competitive advantages," without more, does not connote any concrete corporate action); B&M Linen, Corp. v. Kannegiesser, USA, Corp., 679 F. Supp. 2d 474, 482 (S.D.N.Y. 2010) (distinguishable because a statement about a product's quality or efficacy does not convey information about an action that the company had taken or would be taking); Diaz v. First Am. Home Buyers Prot. Corp., No. 09-cv-00775, 2009 U.S. Dist. LEXIS 139717, at *7–8 (S.D. Cal. Sep. 21, 2009) (distinguishable because plaintiff failed to allege that statements regarding the process and cost of service calls were false).

Accordingly, the Court concludes that the allegedly fraudulent statements here are not puffery or opinion.

### 3.   Scienter

AIP next argues that FAM has failed to plausibly plead fraudulent intent.  [ECF No. 22 at 13–14].

AIP's allegedly fraudulent statements fall into two categories: (1) statements about past or present events (i.e., that it had spent money and was expending resources on the Avalanche brand); and (2) promises regarding future conduct (i.e., that it would continue devoting resources to the Avalanche brand).  With respect to the first category, to prevail, FAM must show that AIP knew the statements were false and made them to induce FAM's reliance.  See Ambac Assurance, 106 N.E.3d at 1182 (applying New York law); Robinson Helicopter, 102 P.3d at 274 (applying California law).  With respect to the second category, FAM must show that, when the promise was made, AIP intended not to honor it and made it to induce reliance.  Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) (applying New York law); Sorensen v. New Koosharem Corp., No. 15-cv-01088, 2015 WL 12826460, at *4 (C.D. Cal. June 29, 2015)

(applying California law).  At this stage, with respect to both categories, FAM must allege facts sufficient to allow the Court to reasonably infer scienter.  N. Am. Catholic Educ. Programming Found., 567 F.3d at 13.

FAM has met its burden with regard to the first category of allegedly fraudulent statements.  FAM alleges that (1) after AIP acquired the Avalanche brand, Avalanche-branded clothing "disappeared from brick and mortar locations outside of club stores," and the Avalanche website became defunct, [Ans. at 6], (2) AIP did not provide FAM with samples, [id. at 7], (3) FAM's club store business suffered significantly after the RBX acquisition, [id.], and (4) Mr. Yedid, AIP's CEO and Managing Partner, made the allegedly false statements while engaged in a dialogue with FAM's representatives regarding the Extension during which FAM's representatives had expressed reservations about the Avalanche brand's "rebuilding" and "retail presence," [id.; ECF No. 23-1 at 2–3].  Taken together, these allegations reasonably allow the inference that, assuming the statements were false, AIP knew they were false and made them to encourage FAM to agree to the Extension.

FAM has also met its burden as to the second category of allegedly fraudulent statements. Under certain circumstances, courts are permitted to infer fraudulent intent based, in part, on a promise and subsequent failure to perform.  See Hoffman v. Optima Sys., Inc., 683 F. Supp. 865, 868 (D. Mass. 1988).  Additionally, FAM has alleged facts demonstrating motive and opportunity, which is a permissible manner of pleading fraudulent intent.  See Brennan v. Zafgen, Inc., 853 F.3d 606, 614 (1st Cir. 2017) (holding that, in the securities context, where a "strong" inference of scienter is required, a plaintiff still may adequately plead scienter based on circumstantial evidence including motive and opportunity).  As to opportunity, FAM has pleaded facts showing that it was vacillating about whether to agree to the Extension when AIP promised

to devote funding to the Avalanche brand and maintain it outside of club stores in the future. [Ans. at 7–8]; see also [ECF No. 23-1 (email demonstrating vacillation)].  As to motive, FAM has alleged that by agreeing to the Extension, FAM was obligating itself to pay AIP at least $750,000 as a guaranteed royalty minimum over the course of the three-year extension period regardless of its sales and even if FAM never sold another Avalanche brand item.[6]  [ECF No. 5 at 19].  Accordingly, AIP had a pecuniary motive to secure FAM's agreement to the Extension. AIP argues that FAM's alleged motive is illogical because AIP had acquired the Avalanche brand just six months earlier and would have wanted it to succeed.  [ECF No. 29 at 9].  AIP also argues that its alleged lack of promotional efforts would have been visible to FAM based on the state of the Avalanche website and the lack of brand presence in non-club stores, which undercuts FAM's allegation of opportunity.  [Id.].  These arguments are unpersuasive.  First, that AIP had recently acquired the Avalanche brand does not necessarily mean that AIP wanted that brand to succeed or provide a measure of how much it was willing to invest to secure that success.  For instance, it is possible that at the time of the acquisition, AIP was hopeful regarding Avalanche's viability, but that circumstances subsequently changed, and AIP determined that whatever resources it would have to expend to increase sales of Avalanche-branded goods, at club stores and elsewhere, would outweigh its potential gains from those increased sales.  In that scenario, the more prudent course might be to execute the Extension, benefit from the guaranteed minimum royalty payments and royalty advance, and not bother expending resources to promote the Avalanche brand.

---

[6] This guaranteed payment could be even greater than $750,000 depending on how much FAM paid in royalties during the initial term of the 2016 Agreement.  See [ECF No. 5 at 19].

As to opportunity, the allegedly fraudulent statement at issue was a forward-looking promise regarding AIP's expenditures in the future.  That AIP's lackluster promotional efforts may have been apparent as of January 2, 2019 in no way suggests that AIP did not have an opportunity to deceive FAM regarding its future promotional effort.

Thus, based on the record before it, the Court concludes that FAM has met its burden of alleging facts leading to a reasonable inference of scienter.

### 4.  Justifiable Reliance

AIP argues that FAM has failed to adequately plead reliance because FAM, knowing that the Avalanche website was defunct and that its sales had declined precipitously before it agreed to the Extension, could not reasonably have relied on AIP's statements.  [ECF No. 22 at 15–16]. Additionally, AIP asserts that because the 2016 Agreement delegates responsibility for promotion to FAM, not AIP, and contains a merger clause stating that the agreement "constitutes the entire understanding of the parties" and "shall not be modified or amended except in writing," any allegedly fraudulent statements purporting to assign responsibility for promotion to AIP would contradict the 2016 Agreement and therefore could not reasonably be relied upon. [Id. at 16; ECF No. 29 at 6–7].  FAM maintains that a merger clause does not bar a fraud claim and that, at this stage, its allegations regarding reliance are sufficient to survive a motion to dismiss.  [ECF No. 26 at 9–10].

FAM has met its burden of demonstrating that it justifiably relied on AIP's statements, which, at this stage, is not particularly high.  See generally Runyon, 2015 WL 1276825, at *5; Hernandez-Cuevas, 723 F.3d at 102–103 (noting that courts should consider complaints as a whole in determining whether the plaintiff has stated facts leading to a reasonable inference of liability).  Given the timing of the statements and the relationship between the parties, it was

justifiable and reasonable for FAM to have relied on AIP's allegedly fraudulent statements.  For months, FAM was on the fence about whether to extend the 2016 Agreement, [ECF No. 23-1 at 3–7], and, in a dialogue with AIP, had suggested that new terms were appropriate in "light of the rebuilding of the brand and its retail presence," [id. at 3].  On January 2, 2019, AIP's CEO and Managing Partner assured FAM that it had "paid a lot of money, and [was] spending significant efforts to make the Avalanche brand greater than ever," [id. at 2], and that "[AIP] would pump funding into the Avalanche brand," [Ans. at 8].  Shortly thereafter, on January 13, 2019, FAM agreed to the Extension.  [Id.].  Against that backdrop, it is not unreasonable for FAM to have relied on AIP's statement when it agreed to the Extension.  In fact, it is difficult to imagine why Mr. Yedid made those statements if not to induce FAM's reliance (or, at the very least, to assure a business partner that AIP was undertaking commercial efforts that would benefit both parties).[7]

As to the merger clause in the 2016 Agreement, AIP asserts that the 2016 Agreement designated FAM as the sole party responsible for promotional activity and therefore, any statements suggesting that AIP would engage in promotion are at odds with the written agreement and therefore should not have been relied upon.  [ECF No. 22 at 16; ECF No. 29 at 6–7].  Put another way, because FAM knew that it, alone, was contractually obligated to promote Avalanche-branded products and that the 2016 Agreement could not be modified unless by written amendment, it could not have reasonably relied on Mr. Yedid's statements that AIP would undertake any promotional efforts.  The 2016 Agreement, however, speaks only to the

---

[7] AIP suggests that Mr. Yedid's statements were not about promotion of the Avalanche brand, [ECF No. 29 at 2–4], but does not offer an alternative interpretation of the statements. Mr. Yedid wrote: "We paid a lot of money, and are spending significant efforts to make the Avalanche brand greater than ever."  [ECF No. 23-1 at 2].  Even though the word "promotion" is absent, the meaning is clear.  Semantics aside, AIP was conveying its commitment to improving the Avalanche brand.

promotion of Avalanche goods *sold at club stores*.  See [ECF No. 5 at 7 (promotion clause); id. at 17 (limiting the scope of the agreement to Costco and Sam's Club stores located in the United States and Mexico)].  Accordingly, the allegedly fraudulent statements at issue here (i.e., that AIP had, was making, and would continue to make efforts to improve the Avalanche brand generally) are not inconsistent with the terms of the 2016 Agreement.  That is, Mr. Yedid's statements do not modify or amend the 2016 Agreement because the 2016 Agreement does not assign responsibility for general brand promotion to either party.

     5.    Summary

For the reasons noted above, FAM has adequately pleaded its fraud claim.  AIP's motion to dismiss the claim is denied as is its motion to strike the promissory fraud affirmative defense which is predicated on the same facts.

## C.    Other Affirmative Defenses

FAM asserts three additional affirmative defenses: that AIP has failed to state a claim, that the unclean hands doctrine bars AIP from recovering, and that AIP failed to mitigate its damages.  [Ans. at 4].  AIP argues that all three affirmative defenses should be struck because FAM has identified no deficiency with how it pleaded its breach of contract claim, the unclean hands defense is unavailable where AIP seeks only damages for breach of contract, and the affirmative defense of failure to mitigate damages does not apply to contracts with acceleration clauses.  [ECF No. 22 at 17-19].

First, AIP contends that it has, in fact, stated a claim for breach of contract under New York law and therefore FAM's failure-to-state-a-claim defense is without merit.  [ECF No. 22 at 17–18].  By asking the Court to strike the defense, AIP is seeking a ruling that its complaint is sufficient.  The Court will not make such a determination at this time.  Under Federal Rule of

Civil Procedure 12(b), a party asserting a failure-to-state-a-claim defense can assert it either in a responsive pleading or by motion.  Fed. R. Civ. P. 12(b).  Here, FAM chose to assert its 12(b)(6) defense in its responsive pleading.  If FAM subsequently moves to dismiss AIP's complaint for failure to state a claim, the Court will assess whether the motion is untimely and, if not, whether AIP has adequately stated a claim.  In the context of an affirmative defense, however, the Court is not currently prepared to find that "it is beyond cavil that [FAM] could not prevail on" its failure-to-state-a-claim defense and will not strike it.  PetEdge, Inc., 2017 WL 2983086, at *4.

Second, it is well-settled under New York law that unclean hands is unavailable as an affirmative defense in actions exclusively for damages.  See Fifth Line, LLC v. Fitch, 91 N.Y.S.3d 135, 138 (N.Y. App. Div. 2018); Greco v. Christoffersen, 896 N.Y.S.2d 363, 366 (N.Y. App. Div. 2010); Manshion Joho Ctr. Co., Ltd. v. Manshion Joho Ctr., Inc., 806 N.Y.S.2d 480, 482 (N.Y. App. Div. 2005).  Here, AIP seeks only damages.  [ECF No. 1 at 6].  FAM nonetheless maintains that "because the entire Extension was procured by fraud, an unclean hands affirmative defense is available," [ECF No. 26 at 10], but cites no authority in support of its position, see [id.].  Although courts are generally reluctant to strike affirmative defenses, a party "may prevail on a Rule 12(f) motion where it clearly appears that the plaintiff would succeed despite any state of facts which could be proved in support of defense."  PetEdge, Inc., 2017 WL 2983086, at *4 (internal quotation marks and citations omitted).  Here, because nothing that FAM could prove would change the fact that AIP seeks only damages, FAM's unclean hands defense is legally insufficient and the Court grants AIP's motion to strike it.

Finally, AIP argues that "non-breaching part[ies] . . . [are] not required to mitigate damages when the governing contract at issue includes an enforceable acceleration clause." [ECF No. 22 at 19].  An acceleration clause relieves a non-breaching party of its duty to mitigate

only if the acceleration clause is enforceable.  See Queens Ballpark Co., LLC v. Vysk

Commc'ns, 226 F. Supp. 3d 254, 259 (S.D.N.Y. 2016).  Here, FAM asserts that the Extension

was procured by fraud, which calls into question the acceleration clause's enforceability.  [ECF

No. 26 at 11].  Accordingly, without first determining whether there was fraud, the Court cannot

find that it is "beyond cavil" that FAM cannot prevail on its mitigation defense.[8]  PetEdge, Inc.,

2017 WL 2983086, at *4.

## IV.    CONCLUSION

For the reasons noted above, AIP's motion, [ECF No. 21], is GRANTED in part and

DENIED in part.  FAM's third affirmative defense (unclean hands), [Ans. at 4], is hereby

STRUCK.  The remainder of AIP's motion, [ECF No. 21], is DENIED.

**SO ORDERED.**

January 15, 2021                                          /s/ Allison D. Burroughs
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE

---

[8] AIP argues that if the Court were to find fraud, "AIP would have no damages to mitigate, making the [mitigation] defense superfluous by FAM's own reckoning."  [ECF No. 29 at 10]. Although this contention is logical on its face, the parties have not thoroughly briefed the issue of whether a mitigation of damages defense is foreclosed by a fraud finding and the Court is not prepared to make such a finding at this stage.  The Court can address the interplay of FAM's affirmative defenses down the line, if necessary.