UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AVALANCHE IP, LLC, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 20-cv-10102-ADB |
| | * | |
| FAM, LLC, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**MEMORANDUM AND ORDER ON**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

BURROUGHS, D.J.

Plaintiff Avalanche IP, LLC ("AIP") initiated this action against Defendant FAM, LLC ("FAM"), alleging breach of contract.  [ECF No. 1 ("Compl.")].  In its answer, FAM raised several affirmative defenses and asserted a counterclaim for promissory fraud.  [ECF No. 16 ("Ans.")].  Currently before the Court is AIP's motion seeking summary judgment on its breach of contract claim, the counterclaim for promissory fraud, and all remaining affirmative defenses. [ECF No. 42].  For the reasons stated below, AIP's motion is DENIED.

I.      **BACKGROUND**

The following facts are drawn primarily from FAM's rebuttal to AIP's Local Rule 56.1 statement, [ECF No. 53], which contains both parties' positions on the material facts, and all documents referenced therein.[1]  Most of the material facts of this case are disputed.

---

[1] Citations to paragraph numbers refer to both AIP's asserted fact and FAM's response.

### A.      The November 2016 License Agreement

On November 28, 2016, FAM executed a license agreement (the "Agreement") with Avalanche Licensing LLC ("AL"), the then-owner of the Avalanche brand (specifically the "Avalanche" and "Avalanche Wear" trademarks) and predecessor to AIP.  [ECF No. 53 ¶ 26].  Pursuant to the Agreement, FAM was granted the rights to design and manufacture Avalanche-branded products and sell them at club stores and was to pay AL royalties in return.  [Id. ¶ 29].

The "Initial Term" of the Agreement ran from November 1, 2016 through December 31, 2018.  [ECF No. 53 ¶¶ 26–27].  It contained two three-year renewal options, the first of which ran from January 1, 2019 to December 31, 2021.  [Id. ¶ 32].  Per the Agreement's terms, FAM was obligated to pay a $350,000 advance at the time of executing the first renewal and $250,000 in minimum guaranteed royalties per year to the licensor for each of the years 2019, 2020, and 2021, [id. ¶ 33], for a total amount owed of $1,450,000, [id. ¶ 34].  In turn, FAM was obligated to "use commercially reasonable efforts to 'promote, market, sell and distribute'" the Avalanche-branded apparel covered by the Agreement.  [Id. ¶ 30].  It did not expressly require the licensor to commit any funding or specific efforts towards promoting the brand, or to provide samples of goods to the licensee.  [Id. ¶ 31].

### B.      AIP Acquires the Avalanche Brand and Renewal of the Agreement

By 2017, AL was experiencing financial hardship and sought to sell the brand.  [ECF No. 53 ¶ 8].  In 2018, a now-AIP member purchased the Avalanche Marks and created AIP thereafter to own those marks.  [Id. ¶ 3].  AIP has two primary business arms.  The first is a licensing program through which it licenses the Avalanche Marks to third parties for use in connection with various goods, such as apparel, pet products, and backpacks, [id. ¶ 4], and the second is a

direct-to-consumer e-commerce business that is operated by a related company, Avalanche
District LLC, [id. ¶ 5]. These two arms reflect AIP's then two-part plan to "revitalize" the
Avalanche brand, which included a wholesale push to get more products into the marketplace
through licensees and a direct-to-consumer push which involved marketing and selling directly
to consumers through social media, the Avalanche website, and other e-commerce websites at a
reasonable price point. [Id. ¶¶ 10, 12–13].

Even after AIP's acquisition, FAM's sales of Avalanche-branded products continued to
plummet, from $6.7 million in 2017 to $3.1 million in 2018. [ECF No. 53 ¶¶ 35–36]. Norah
Emamjomeh ("Emamjomeh")—Senior Vice President, Strategic Accounts, and point person for
the Avalanche brand at FAM—reported these losses to Eli Yedid ("Yedid"), AIP member and
licensing manager. [Id. ¶ 37]. FAM attributed these losses to issues it had with AL that
preexisted AIP's acquisition, specifically that "the brand's penetration into retail was, spotty, and
largely not available to FAM[,]" as well as concerns about the "newness" of the line of products
presented by AL, which included "duplicative and similar samples." [Id. at ¶¶ 35–36]. Soon
after AIP acquired Avalanche, Emamjomeh raised these issued with Yedid, who agreed that its
predecessor's approach was antiquated. [Id. ¶¶ 37–38]. Discussions followed in the summer
and fall of 2018 between Yedid and Emamjomeh about the actions AIP would take to right AL's
wrongs and put the brand on a path to success. See [ECF No. 45 ¶ 20 ("Yedid Decl.")]. Yedid
has testified that "[i]n order for FAM to be successful going forward, Ms. Emamjomeh said that
the AVALANCHE brand needed to be a 'relevant' brand that was present outside of the club
channels, with penetration into other retail outlets and a functioning e-commerce website, and
that FAM wanted to be provided with samples of the products that were being sold elsewhere."
[Id.]. Emamjomeh testified that Yedid told her that "there would be a very big sales push" in

Cabela's and similar retailers, plus rebuilding the website, and improvements in design and product development.  See [ECF No. 55-1 at 59:10-60:4 (Emamjomeh Depo.)]; [ECF No. 53 ¶ 38].  She interpreted this to mean that AIP would launch these efforts "in the first half of 2019." [Id. ¶ 39].  AIP, for its part, states that "[t]he parties never discussed when AIP would be completing any of the promotional and marketing activities or the investments in the brand that they discussed."  [Id.].  Yedid also asserts that he communicated to Emamjomeh that part of its plan was to find new licensees.  [Id. ¶ 38]; [ECF No. 55-2 at 47:14–49:20 (Yedid Depo.)].

In the fall of 2018, FAM expressed interest in renewing the Agreement, but delayed sending a draft of a proposed renewal to AIP.  [ECF No. 53 ¶¶ 40, 44–46].  After numerous inquiries from AIP, John Spotts ("Spotts"), Executive Vice Present, Licensing and International at FAM, sent a draft renewal to AIP on January 1, 2019.  [Id. ¶¶ 44–47].  The draft cut the size of the advance payment and the guaranteed minimum royalties that were set out in the Agreement. [Id. ¶ 47].  These adjustments, according to FAM, were made to account for the possibility that the Avalanche brand could be slow to bounce back.  [Id. ¶ 48].  On January 2, 2019, Yedid, surprised by the unexpected adjustments, emailed Emamjomeh and Spotts and said, in part, that AIP was not interested in renewal and that it had "paid a lot of money, and are spending significant efforts to make the Avalanche brand greater than ever. It will be a $100 million+ brand by 2021."  [Id. ¶¶ 49–50].

Even though AIP rejected the proposed draft, on or around January 14, 2019, FAM decided to exercise its original first renewal option, extending the Agreement through December 31, 2021 (the "Amendment").  [ECF No. 53 ¶¶ 52–53; ECF No. 23-1 at 2].  Regarding the reason for renewal, Emamjomeh testified that (1) "I didn't have any reason to think that [AIP] wasn't

going to do all the things that they said, and if they were going to do all the things that they said, we would have a ten-million dollar brand."  [Id. ¶ 52]

Once executed, the Amendment obligated FAM to pay AIP the royalty advance of $350,000 and a guaranteed minimum royalty payment of $250,000 on July 1 of each year of the extension period (i.e., 2019, 2020, and 2021).  [ECF No. 53 ¶¶ 54–55].

### C.    Termination

AIP alleges that within five months of signing the Amendment, FAM "began to devise ways to avoid making" the first royalty payment.  [ECF No. 53 ¶ 56].  FAM counters that it declined to make the payment because it realized "it had been left alone on the market by AIP." [Id.].

On August 21, 2019, AIP notified FAM that its failure to make the first guaranteed minimum royalty payment due on July 1, 2019 constituted a material breach and default under the Agreement and that failure to cure its breach would give AIP the right to terminate the Agreement effective immediately.  [ECF No. 53 ¶ 58].  The Notice of Default offered FAM a thirty-day period to make a full payment, but FAM declined.  [Id. ¶ 58].  AIP terminated the Agreement by notice of termination sent on January 16, 2020.  [Id. ¶ 59].  Paragraph 3.11 of the Agreement provides that all late payments are assessed at an interest rate of one percent per month from the due date of such payments[,]" [id. ¶¶ 59–60], and paragraph 3.9 of the License Agreement states that "[u]pon the expiration or termination of this Agreement, all Royalty obligations, including any unpaid portions of the Extension Term Guaranteed Minimum Royalty, should this Agreement have been extended, shall immediately become due and payable."  [Id. ¶ 61].  Accordingly, AIP contends that it "is entitled to recover $250,000, plus interest at 1% per month commencing on July 1, 2019 through the date of judgment herein . . . . [and] an additional

5

$500,000 in accelerated guaranteed minimum royalty payments due as of January 16, 2020, plus interest at 1% per month commencing on January 16, 2020 through the date of judgment herein." [Id. ¶ 62].  FAM disputes that any payment is owed due to AIP's alleged fraud but secondarily disputes that $500,000 plus interest is owed because there is no acceleration clause in the Agreement and because AIP has at least partially mitigated.  [Id.]

### D.   Fraud-Based Counterclaim and Defenses to Breach

FAM argues that it does not owe payment because AIP made fraudulent statements to induce it sign the Amendment.  [ECF No. 53 ¶ 63].  Specifically, FAM alleges that Yedid falsely stated in his January 2, 2019 email that AIP was "spending significant efforts to make the Avalanche brand greater than ever[,]" [id. at ¶ 64], and also falsely stated that AIP "would pump funding into the Avalanche brand and maintain it as a real brand outside of club stores[]" [id. ¶ 81], when, in fact, AIP had not expended the efforts or resources it alleged and had no intention of doing so in 2019.  Although AIP contends that it did make significant efforts on the wholesale sales front during the relevant time period, [id. ¶¶ 69, 82], FAM asserts that it also expected to see efforts towards a consumer push within the first year of the Amendment, [ id. ¶ 67].  AIP also states that it never promised to meet these goals in 2019 and that it did eventually spend $108,000 on direct-to-consumer efforts.  FAM responds that absence of such efforts in the first 20 months after the Amendment, during which there was no online promotion of the brand, including no changes to a non-functioning website, and a "de minimis" presence in stores, made FAM's brand-related business untenable.  [Id. ¶ 82].  In sum, FAM states that "[h]ad AIP disclosed that it did not intend to engage in consumer-facing efforts for a year, FAM would never have renewed."  [Id. ¶ 52].

FAM also alleges that Yedid also falsely represented that AIP would supply FAM with samples of Avalanche goods, and its subsequent failure to provide adequate samples made it "impossible for FAM to sell Avalanche goods to club stores." [ECF No. 53 ¶ 70]. AIP counters that it supplied FAM with samples sufficient to fulfill its commitment and that it never promised to supply a certain number or type of samples. [Id. ¶ 71].

As a final note regarding its efforts, AIP asserts that the promised investment in the brand has, in fact, paid off, resulting in a steep sales increase. [ECF No. 53 ¶ 83]. FAM disputes this, claiming sales were actually down each year. [Id.].

### E.    Procedural Background

On January 17, 2020, AIP sued FAM, alleging that FAM had breached the Agreement, and the Amendment, by failing to make the $250,000 guaranteed minimum royalty payment due on July 1, 2019 (and failing to cure the breach during the contractual cure period). [Compl. ¶¶ 16–17, 23–25]. In its answer, on February 21, 2020, FAM asserted four affirmative defenses: (1) that AIP has failed to state a claim, (2) that AIP fraudulently induced FAM to agree to the Amendment, (3) that AIP cannot recover because it has unclean hands, and (4) that AIP failed to mitigate damages, [Ans. at 4], and then counterclaimed against AIP alleging promissory fraud, see generally [Ans. at 8–9].[2] On March 13, 2020, AIP moved to dismiss FAM's counterclaim and strike its affirmative defenses. [ECF No. 21]. On January 15, 2021, the Court granted AIP's motion to dismiss only as to FAM's third affirmative defense (unclean hands), [Ans. at 4], and denied the remainder of AIP's motion, [ECF No. 31]. AIP then answered FAM's counterclaim complaint. [ECF No. 32]. Following discovery, on September 21, 2021, AIP moved for

---

[2] As this Court has already noted, FAM's counterclaim for promissory fraud is, in substance, identical to the fraud-based affirmative defense. See Avalanche IP, LLC v. FAM, LLC, No. 20-cv-10102, 2021 WL 149258, at *4 (D. Mass. Jan. 15, 2021) (Order on Motion to Dismiss).

summary judgment on its breach of contract claim and on FAM's affirmative defenses and counterclaim of fraud, [ECF No. 42], which FAM has opposed, [ECF No. 52].  Although largely unhelpful and no doubt expensive, more briefing followed.  See [ECF Nos. 43, 52, 65, 72, 75.]

## II.      LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in original) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way."  Id. (citation omitted).  By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case."  United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'"  Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough

competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted).  That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact." Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted).  The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation[,]" Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).

## III.     DISCUSSION

### A.     Choice of Law

The Agreement contains a New York choice-of-law provision and the parties seemingly agree that New York law governs AIP's claim for breach of contract and two of FAM's remaining affirmative defenses: failure to state a claim and failure to mitigate damages.  See [ECF No. 43 at 8–9].  As to the fraud counterclaim and affirmative defense, the parties also seemingly agree that the Agreement's choice-of-law provision does not control, with AIP

9

contending that New York law governs and FAM asserting that California law governs.  [Id. at 7–8].  Because both parties agree that California and New York law are essentially the same with respect to fraud, and because the choice of law between these two will not change the outcome, the Court need not decide which state's law controls.  Okmyansky v. Herbalife Intern. of Am., Inc., 415 F.3d 154, 158 (1st Cir. 2005).  Accordingly, the Court, consistent with its January 15, 2021 Order on AIP's motion to dismiss, will assess FAM's fraud-based counterclaim and defense with reference to both California and New York law, which it finds materially indistinguishable for present purposes, and then assess the breach of contract clam and the two remaining affirmative defenses under New York law.

> ### B.      FAM's Promissory Fraud Counterclaim and Defense

FAM's rests its counterclaim of promissory fraud, or fraudulent inducement, on the premise that AIP knowingly made false representations about the scope of the resources and efforts it had already spent and planned to expend on the Avalanche brand to convince FAM to renew and sign the Amendment.  AIP has moved for summary judgment on the claim, but, as should have been obvious to both parties, there are abundant factual disputes throughout the record that preclude summary judgment.

Under New York law, the "required elements of a common-law fraud claim are a misrepresentation or material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  Ambac Assurance Corp. v. Countrywide Home Loans, Inc., 106 N.E.3d 1176, 1182 (N.Y. 2018) (alteration in original) (citation and internal quotation marks omitted).  Similarly, under California law, the "elements of fraud are: (1) a misrepresentation (false representation, concealment, or

nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce

reliance; (4) justifiable reliance; and (5) resulting damage." Robinson Helicopter Co. v. Dana

Corp., 102 P.3d 268, 274 (Cal. 2004) (citing Lazar v. Super. Ct. of L.A. Cnty., 909 P.2d 981, 984

(Cal. 1996)).[3]  "An action for promissory fraud may lie where a defendant fraudulently induces

the plaintiff to enter into a contract." Engalla v. Permanente Med. Grp., Inc., 15 Cal. 4th 951,

973–74 (1997), as modified (July 30, 1997).

        1.    FAM's Theory of Omission

        Preliminarily, FAM has raised an alternative theory of fraud based on omission of

material facts as "an additional basis to deny summary judgment." [ECF No. 52 at 15].  FAM

asserts that it learned during discovery that AIP "withheld material information" about the

"timing and sequence of AIP's plans [to boost the brand]" based on Yedid's testimony that he

"knew that doing this would take at least a year, and would have said as much to FAM if anyone

ever asked." [Id.; Yedid Decl. ¶ 47].  AIP asserts that FAM cannot raise an entirely new claim

for fraudulent concealment to ward off summary judgment.  [ECF No. 65 at 5].  While the Court

agrees with AIP that summary judgment is not an opportunity to raise new claims or theories of

liability, especially fraud-based claims, the Court will consider the alternative theory of omission

here because it is based on the same facts that underlie FAM's original counterclaim.  The

purpose of disfavoring new claims on summary judgment is to ensure that defendants have

timely and complete notice of the allegations against them so that they can adequately defend

themselves.  Here, however, there are no facts tied to this theory of omission that were not

explored in discovery and that AIP has not been long aware of.  See Muchhala v. Spectrum

---

[3] The parties do not contest the injury element of this particular claim so the Court will not
address it.

Admin., No. 05-cv-0863, 2006 WL 2237699, at *2 (E.D. Cal. Aug. 4, 2006).  The cases AIP

cites are all distinguishable because they involve the introduction of entirely new statutory

claims, see In re Citigroup, Inc., MDL No. 1354 (NG), 2011 U.S. Dist. LEXIS 36986, at *15 n. 3

(D. Mass. Mar. 31, 2011), or claims based on new factual premises, see IV Sols., Inc. v. Conn.

Gen. Life Ins. Co., No. 13-cv-9026, 2015 U.S. Dist. LEXIS 189753, at *61 (C.D. Cal. Jan. 29,

2015) (new fraud-based claims which are "entirely unrelated to fraud theories alleged" in

operative complaint cannot be raised at summary judgment); see also Wachovia Sec., LLC v.

Neuhauser, 528 F.Supp.2d 834, 848 (N.D. Ill. 2007); Canter v. West Publ'g Co., No. 96-cv-

20440, 1999 U.S. Dist. LEXIS 3815, at *33–36 (N.D. Cal. Jan. 6, 1999); Diomed Inc. v.

Vascular Sys., Inc., 417 F. Supp. 2d 137, 141 (D. Mass. 2006).  Here, the omission argument

relates to facts about the website, discussions between Yedid and Emamjomeh leading up to the

Amendment, and other promotional and business issues, all of which have been fully developed

in discovery.

    To the extent AIP argues that a theory of fraudulent concealment or omission cannot be

raised at this stage because it requires an additional element of proof, namely that the defendant

was under a duty to disclose the fact to the plaintiff, see Copart, Inc. v. Sparta Consulting, Inc.,

277 F. Supp. 3d 1127, 1148–49 (E.D. Cal. 2017), the Court does not find that there is anything

substantively new about this element either.  As FAM notes, "[s]uch a duty may exist . . . even

where a person has no duty to speak . . . if he undertakes to do so, either voluntarily or in

response to inquiries, he is bound not only to state truly what he tells but also not to suppress or

conceal any facts within his knowledge which materially qualify those stated . . . . If he speaks at

all he must make a full and fair disclosure."  Id.; see also Brass v. Am. Film Techs., Inc., 987

F.2d 142, 150 (2d Cir. 1993).  As discussed at-length *infra*, a reasonable factfinder could

conclude based on the evidence already presented that Yedid intentionally omitted the timeline for actualizing these projects to induce FAM's reliance, or alternatively, that his statements were not misleading so as to give rise to such a duty.  Copart, Inc., 277 F. Supp. 3d at 1148–49 ("Whether a duty exists can be a fact-intensive question best left for a trier of fact.")

        2.   <u>Falsity</u>

AIP argues that it is entitled to summary judgment on the promissory fraud counterclaim because discovery has proved that all the alleged misrepresentations that form the bases of FAM's counterclaim were true.  [ECF No. 43 at 2].

In support of its motion, AIP points to evidence that it, at the time these statements were made and at all relevant times after, "(i) devot[ed] time and money to build up the wholesale side of the AVALANCHE business . . . (ii) expand[ed] the AVALANCHE product line by signing and re-signing licensees, . . . (iii) create[ed] marketing collateral in order to secure more AVALANCHE licensees, . . . (iv) set[] up a New York showroom for AVALANCHE goods, . . . and (v) book[ed] a booth at a major trade show, in part at FAM's request, for later in 2019." [ECF No. 43 at 11].  AIP adds that, after 2019, it "launched a successful ecommerce website for AVALANCHE goods[,]" invested "more than $100,000 into the marketing and advertising of AVALANCHE goods[,]" all of which resulted in the growth of the business and increased wholesale sales.  [Id. at 17].

FAM counters that these efforts have been largely overstated, that they did not happen in the time period promised, and were, in any case, insufficient to fulfill the promises AIP made while the two sides were negotiating the Amendment.  [ECF No. 52].  For example, with respect to Yedid's statement in the January 2, 2019 email that AIP was "spending significant efforts," FAM asserts that the evidence has shown that any efforts at this time were insignificant and that

AIP's monetary investment in Avalanche when Yedid made this statement was less than $1,000. [ECF 53 ¶¶ 66–67].

Regarding the future promise to "pump funding" into the brand to promote it "outside of club stores[,]" the parties essentially agree that no efforts on the direct-to-consumer push occurred in the first year after the Amendment.  [ECF No. 52 at 9–11; ECF No. 65 at 6–8.  FAM has presented evidence that, throughout all of 2019, AIP also did not make the "big sales push at Cabela's" that Yedid promised to Emamjomeh, did not spend any money on online advertising (which AIP does not dispute), and did not set up "an active consumer-facing website" also as promised.  [ECF No. 52 at 9].  AIP, for its part, argues that it did eventually launch the website and spend significant money on advertising, and that none of the statements made represented that these things would occur in a specific time period.  [ECF No. 43 at 18].[4]   Yedid testified that "[t]here was never any specific discussion regarding when the AVALANCHE website would launch. We also never discussed any sort of timeline for the efforts AIP was undertaking." [Yedid Decl. ¶ 47].  FAM counters that AIP was familiar with FAM's business model and "was well aware, from its discussions with FAM, that if it engaged in no consumer-facing efforts in 2019, FAM would be unable to market its product," [ECF No. 52 at 16], or reach the agreed upon goal of becoming "a hundred-million dollar brand by 2021[,]" [ECF No. 56-3 at 59:8–19].[5]

---

[4] In its briefing, AIP has also argued that FAM has attempted to "transform" its counterclaim by mentioning false promises of "consumer-facing" efforts for the first time in its opposition to summary judgment, [ECF No. 65 at 2], but this is hardly a transformation.  From the moment FAM answered AIP's complaint, throughout briefings on the motion to dismiss, discovery, and to now, FAM's counterclaim has always been about what AIP did, or did not do, with regard to promoting the brand and this has always included a discussion of "direct-to-consumer" efforts. Whether "consumer-facing" has appeared as a descriptive term prior to this briefing is irrelevant.

[5] With regard to the new website specifically, Emamjomeh stated that Yedid promised AIP would relaunch it "soon."  [ECF No. 54 ¶ 9 ("Emamjomeh Decl.")].  The parties now dispute whether "soon" is sufficiently specific language on which to base a fraud claim. "Whether a

Similarly, the parties also dispute whether AIP's supply of sample product fulfilled its promise to FAM.  In AIP's view, this was only a "general promise" without any specific commitment as to type or number and that AIP therefore fulfilled the promise by sending any samples at all, see [ECF No. 43 at 11–14; ECF No. 52 at 11–13], especially since AIP's ability to provide samples was limited because it did not design or create Avalanche goods itself, but relied on licensees to develop them,  [ECF No. 53 ¶ 78].

Whether the amount already spent by AIP in January 2019 was "substantial," whether the efforts and resources it did eventually spend were enough to promote the brand outside of club stores, whether this was done in the reasonable time frame suggested, or whether the samples provided were sufficient to realize AIP's promise to FAM are all questions of fact to be reserved for the factfinder.  A reasonable jury could conclude that AIP truthfully described its existing efforts and future promises, or that Yedid's statements knowingly misrepresented the steps AIP had taken and the steps it eventually took.  While AIP may ultimately convince a jury that they are correct, summary judgment is entirely inappropriate in light of the myriad of fiercely disputed facts.

---

representation is 'mere puffery' depends, in part, on the context in which it is made." In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).  Here, Yedid's alleged promise to act "soon" was made with regard to a specific website that was a key part of discussions surrounding the extension of the Agreement between AIP and FAM.  This is not the type of "vague generalization[]" that cannot constitute an actionable promise, President Container Grp. 11, LLC v. Systec Corp., 467 F. Supp. 3d 158, 166–67 (S.D.N.Y. 2020), but rather is capable of being objectively evaluated by reasonable jury in light of all the relevant facts, see Lion Raisins, Inc. v. Conn. Indem. Co., No. 03-cv-6744, 2006 WL 509536, at *14 (E.D. Cal. Mar. 2, 2006) (finding statement that insurance company would investigate claims "promptly" and "thoroughly" potentially actionable).

3.      Intent

AIP also challenges the intent element, [ECF No. 43 at 11–15], but FAM has identified

enough evidence upon which a reasonably jury could infer that AIP intentionally misrepresented

facts to FAM to induce it into extending the Agreement.

Issues of intent are "primarily factual" but a party opposing summary judgment on a

fraud claim nonetheless "must set forth specific facts showing that there is a genuine issue for

trial.'" Ccm Rochester, Inc. v. Federated Invs., Inc., 234 F. Supp. 3d 501, 506 n.11 (S.D.N.Y.

2017) (quoting Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006)); Fanucchi &

Limi Farms, 414 F.3d 1075, 1088 (9th Cir. 2005) ("Affirmative evidence is necessary to avoid

summary judgment because mere nonperformance is not enough to show intent to defraud.").

"A plaintiff may establish scienter by either showing that 'defendants had both motive and

opportunity to commit fraud' or by showing 'evidence of conscious misbehavior or

recklessness.'" Aguirre v. Best Care Agency, Inc., 961 F. Supp. 2d 427, 451 (E.D.N.Y. 2013).

With respect to promises regarding future conduct "a mere promissory statement as to what will

be done in the future does not constitute a material misrepresentation of fact, [but] a promise

made with a preconceived and undisclosed intention of not performing it does." Senior Health

Ins. Co. of Penn. v. Beechwood Re Ltd., 345 F. Supp. 3d 515, 527 (S.D.N.Y. 2018)

(quoting Spinelli v. Nat'l Football League, 903 F.3d 185, 210 (2d Cir. 2018)).

Nevertheless, courts must be "lenient in allowing scienter issues to withstand summary

judgment based on fairly tenuous inferences, because such issues are appropriate for resolution

by the trier of fact." King Cnty., Wash. v. IKB Deutsche Industriebank AG, 916 F. Supp. 2d

442, 448 (S.D.N.Y. 2013) (internal quotation marks omitted); Century Pac., Inc. v. Hilton Hotels

Corp., 528 F. Supp. 2d 206, 219–20 (S.D.N.Y. 2007), aff'd, 354 F. App'x 496 (2d Cir. 2009)

("Still, summary judgment should be considered skeptically in cases alleging fraudulent inducement, because the issues typically turn on the parties' credibility as to their state of mind.").

FAM has presented evidence on which a reasonable factfinder may conclude that Yedid knew his statements regarding current events (i.e., that AIP had spent money and was expending resources on the Avalanche brand) and future promises (i.e., that AIP would pour funding into the brand to promote it outside of club stores and provide product samples to FAM) were false when he made them, but made them anyway to induce FAM's reliance and secure the Amendment. The record shows that FAM was hesitant to sign the Amendment, that AIP was aware of FAM's frustrations with its predecessor licensor (particularly its failure to provide adequate samples and to promote the brand in retail), and knew what FAM wanted to see from a new licensor partner. There is also evidence that AIP knew or should have known that failure to execute the contemplated changes within the first year of the Amendment would be fatal to FAM's brand-related business.

AIP renews an argument it first made in support of its motion to dismiss the fraud counterclaim, which is that it had no motive not to support the brand as promised, [ECF No. 43 at 5–6], but this argument remains as unpersuasive now as it was then. AIP had a pecuniary motive to secure the Amendment. Upon signing the Amendment, FAM obligated itself to pay AIP at least $750,000 as a guaranteed royalty minimum over the course of the three-year extension period regardless of its sales, even if FAM never sold another Avalanche brand item. Indeed, AIP could have decided that since the brand continued to falter, it was no longer worth expending resources to revitalize it, but that it could instead secure the Amendment and reap the immediate pecuniary benefits.

Drawing all justifiable inferences in favor of FAM, the Court finds that there is sufficient evidence from which a trier of act could find that AIP did not believe the statements when it made them and did not intend to perform its alleged promises.  Cf. Century Pac., Inc., 528 F. Supp. 2d at 225 (S.D.N.Y. 2007) (summary judgment on fraudulent inducement claim appropriate where a court finds that "even giving every favorable weight that could arise from credibility determinations at trial, a reasonable fact finder still could not hold for [opposing party]")

      4.    Reliance

Much like the issue of intent, "reasonable reliance is often a question of fact for the jury rather than a question of law for the court." Copart, Inc., 277 F. Supp. 3d at 1151; see also King Cnty., Wash, 916 F. Supp. 2d at 448 ("An evaluation of the reasonable-reliance element [should involve] many factors to consider and balance, no single one of which is dispositive.") (internal quotation marks omitted)); Dias v. Nationwide Life Ins. Co., 700 F.Supp.2d 1204, 1218 (E.D. Cal. 2010) ("Justifiable reliance is normally a question of fact for a jury" except in "rare cases.") (internal quotation marks omitted)).  "In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003).

The record is replete with genuine disputes of material fact that preclude summary judgment on the issue of reliance.  Given the relationship between the parties, the known issues with AL, and the timing of the statements in relation to the execution of the Amendment, there is sufficient evidence from which a factfinder could conclude that FAM's reliance was reasonable.

Accordingly, AIP's motion for summary judgment on the promissory fraud claim is DENIED.

**C.      AIP's Breach of Contract Claim**

AIP has also moved for summary judgment on its breach of contract claim, but the same disputes of fact that preclude summary judgment on FAM's counterclaim also preclude summary judgment on AIP's breach of contract claim.  "It is well established that fraud in the inducement may provide a defense to a breach of contract claim." Clarke v. Max Advisors, LLC, 235 F. Supp. 2d 130, 142 (N.D.N.Y. 2002); Xerox Corp. v. Bus-Let, Inc., No. 18-cv-6725, 2019 WL 2514855, at *5 (W.D.N.Y. June 18, 2019) (same); Madico, Inc. v. GMX Performance Films, PTE, LTD, No. 06-cv-10953, 2009 WL 10692794, at *18 (D. Mass. Aug. 6, 2009) (same).  As already discussed at length, there are genuine disputes of material fact as to whether AIP made misrepresentations to fraudulently induce FAM into signing the Amendment, which must be resolved by a jury rather than by the Court.  See Wang Lab'ys, Inc. v. Ma La'ys, Inc., No. 95-sc-2274, 1995 WL 729298, at *14 (N.D. Cal. Dec. 1, 1995) (denying plaintiff's motion for summary judgment on its breach of contract claim where genuine disputes of fact remained that precluded summary judgment on fraudulent inducement counterclaim).

**D.      Affirmative Defenses**

1.      Failure to Mitigate

AIP has also moved for summary judgment on FAM's affirmative defense of failure to mitigate.  [ECF No. 43 at 19–20].

FAM raised this affirmative defense in its answer to AIP's complaint and, during briefing on AIP's motion to dismiss the counterclaim and affirmative defenses, argued that the Court could not rule upon the mitigation affirmative defense until the fraud counterclaim was ruled

upon.  [ECF No. 26 at 11].  The Court agreed and declined to rule on the enforceability of the

acceleration clause without first determining whether the entire contract was precured by fraud.

Avalanche, 2021 WL 149258, at *10 (citing Queens Ballpark Co., LLC v. Vysk Commc'ns, 226

F. Supp. 3d 254, 259 (S.D.N.Y. 2016).

FAM, in an about-face, now states that "the evidence shows that AIP has at least partially

mitigated" based on its club store sales, [ECF No. 53 ¶ 62], and argues that the Court, if AIP

should prevail on its claim, should not permit it to receive a "windfall" in the form of the

$750,000 it demands, thus refashioning its failure to mitigate defense into a general "mitigation"

defense, [ECF No. 52 at 18–19].  In response, AIP seeks summary judgment in its favor on the

premise that mitigation of damages is irrelevant when accelerated guaranteed minimum royalty

payments are prescribed by the contract upon termination.  [ECF No. 43 at 19–20].  The merits

of this dispute aside, the Court is still not able to rule on the availability of damages without first

ruling on fraud.

Accordingly, summary judgment in AIP's favor on this defense is DENIED.

2.     Failure to State a Claim

A failure to state a claim defense, though more commonly raised in a motion to dismiss

on the pleadings under Federal Rule of Civil Procedure 12(b)(6), may be adjudged by the court

on summary judgment.  See Greystone v. Koninklijke Luchtvaart Maatschappij N.V., 815

F.Supp. 745, 758–59 (S.D.N.Y. Mar. 18, 1993) ("[T]he question becomes whether the defendant

has failed to state a claim as a matter of law.").

Under New York law, "the elements of a breach of contract claim are a contract, the

plaintiff's performance under the contract, the defendant's breach, and damages resulting from

the breach."  Sunoco, Inc. (R & M) v. 175-33 Horace Harding Realty Corp., 969 F. Supp. 2d

297, 305 (E.D.N.Y. 2013), aff'd sub nom. Sunoco, Inc. (R&M) v. 175-33 Horace Harding Realty Corp., 697 F. App'x 38 (2d Cir. 2017) (citing Elisa Dreier Reporting Corp. v. Global Naps Networks, Inc., 921 N.Y.S.2d 329, 333 (N.Y. App. Div. 2011)).  It is undisputed that there was a contract between the parties, but FAM's fraud-based counterclaim and defense, and its affirmative defense on damages preclude a finding on the remaining elements.  Accordingly, summary judgment in AIP's favor on this defense is DENIED.

## IV.    CONCLUSION

For the reasons noted above, AIP's motion, [ECF No. 42], is DENIED.

**SO ORDERED.**

August 23, 2022                                      /s/ Allison D. Burroughs
                                                           ALLISON D. BURROUGHS
                                                           U.S. DISTRICT JUDGE